UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| HEATHER ATWELL; HEATHER ATWELL as TRUSTEE of Atwell Family Trust; HEATHER ATWELL as ADMINISTRATOR of the Estate of David Atwell; and RESORT PROPERTIES OF AMERICA, INC., <br><br>Plaintiffs, <br><br>v. <br><br>WESTGATE RESORTS, INC.; WESTGATE RESORTS LTD.; CENTRAL FLORIDA INVESTMENTS, INC.; and WESTGATE LAS VEGAS RESORT, <br><br>Defendants. | Case No. 2:15-cv-02122-RFB-PAL <br><br>ORDER |

## I. INTRODUCTION

Before this Court are Defendants Westgate Resorts, Inc., Westgate Resorts Ltd., Central Florida Investments, Inc., and Westgate Las Vegas Resort (collectively, "Defendants") Motion for Summary Judgment (ECF No. 60), and Plaintiffs Heather Atwell, Heather Atwell as Trustee of Atwell Family Trust, Heather Atwell as Administrator of the Estate of David Atwell, and Resort Properties of America, Inc. ("RPA") (collectively, "Plaintiffs")' Motion for Partial Summary Judgment (ECF No. 64). For the reasons stated below, these motions are denied.

## II. PROCEDURAL HISTORY

Plaintiffs original filed the Complaint with Jury Demand in the Eighth Judicial District Court of Clark County, Nevada on October 6, 2015. (ECF No. 1-1). Defendants removed the case on November 5, 2015, on the grounds of diversity jurisdiction. (ECF No. 1). Plaintiffs made a jury demand in this Court on November 23, 2015. (ECF No. 16). The Court had a hearing on

Defendants' Motion to Dismiss for Lack of Jurisdiction on September 22, 2016, where the motion was granted in part and denied in part. (ECF No. 46). During the hearing, the Court granted Plaintiffs leave to amend the Complaint.

Plaintiffs filed an Amended Complaint with Jury Demand on November 18, 2016. (ECF No. 49). In the Amended Complaint, Plaintiffs assert the following causes of action: count I - breach of contract, on behalf of all Plaintiffs except Heather Atwell individually; count II – breach of the implied covenant of good faith and fair dealing, on behalf of all Plaintiffs except Heather Atwell individually; count III – quantum meruit, on behalf of all Plaintiffs except Heather Atwell individually; count IV – quantum meruit, on behalf of Heather Atwell individually; count V – fraud, on behalf of all Plaintiffs except Heather Atwell individually; and count VI – fraud, on behalf of Heather Atwell individually. Defendants filed Answers on December 19, 2016. (ECF Nos. 52, 53, 54, 55). On April 21, 2017, Defendants filed a Motion for Summary Judgment. (ECF No. 60). Plaintiffs also filed a Motion for Summary Judgment on April 21, 2017. (ECF No. 64). Responses were filed on May 19, 2017. (ECF Nos. 72, 73). Plaintiffs filed their Reply on June 9, 2017. (ECF No. 77). Defendants also filed a Reply on June 9, 2017. (ECF No. 78). The Court held a hearing on the motions on March 21, 2018, and took the matter under submission.

### III. UNDISPUTED FACTS

The Court finds the following facts to be undisputed.

#### A. The Parties

Plaintiff Heather Atwell ("Ms. Atwell") is a licensed real estate agent in the State of Nevada, and was a licensed real estate agent at certain periods relevant to the facts at issue. Ms. Atwell is also the Trustee of Plaintiff the Atwell Family Trust and the Administrator of Plaintiff the Estate of David Atwell. Ms. Atwell's father, David Atwell ("Mr. Atwell"), was a licensed Las Vegas real estate broker who specialized in hotel and casino properties in Las Vegas. Mr. Atwell operated a sole proprietorship that did business under the name "Resort Properties of America" until March 13, 2013. On June 24, 2008, Ms. Atwell began working alongside Mr. Atwell in rendering brokerage services at his sole proprietorship, by associating her real estate agent's

1 license with Mr. Atwell's real estate broker's license, and continued to work in association with
RPA until Mr. Atwell's death on November 25, 2013.

RPA was incorporated on March 13, 2013 in the State of Nevada. RPA as a corporate entity is a Plaintiff in this suit. Ms. Atwell is the current sole officer, director, and shareholder of Plaintiff Resort Properties of America, Inc.

Defendant Central Florida Investments, Inc. ("CFI") is the parent company of the other Defendants in this action, Westgate Resorts, Inc., Westgate Resorts, Ltd., and Westgate Las Vegas Resorts, LLC. David Siegel ("Siegel") is the founder, president, and sole shareholder of CFI. Due to this structure, regardless of which Westgate entity is involved, all actions allegedly taken by any Defendant are attributed to CFI.

**B.     Prior Relationship Between Mr. Atwell and Siegel**

Mr. Atwell had known Siegel for over 20 years prior to the events at issue in this litigation. Mr. Atwell assisted Defendants in an attempt to procure financing to prevent the foreclosure of the former Planet Hollywood Westgate Tower ("PH Tower") in 2011. Defendants were unsuccessful in keeping the former PH Tower, which they ultimately lost to their creditors in November 2011. PH Tower was the only Westgate-affiliated property in Las Vegas until 2014.

**C.     Mr. Atwell's Initial Efforts to Find a Property for Defendants**

In September 2011, Mr. Atwell spoke by phone with Adam Rosenberg ("Rosenberg"), then Global Head of Gaming at Goldman, Sachs & Co, regarding the Las Vegas Hilton ("LVH"). Mr. Atwell and Rosenberg exchanged emails regarding the discussion. Rosenberg stated that Goldman Sachs was a 70% owner of the debt attached to the LVH, and that "[if] there [was] a real buyer with real interest, [he was] the right portal to explore what can be done." In these emails, Mr. Atwell wrote that his client was David Siegel of Westgate Resorts.

On January 17, 2012, Mr. Atwell sent an email to Rosenberg stating: "Don't mean to be a bother, but I'm anxious to find out the disposition of the property and it's [sic] owners. We don't want to waste our time, but will come forward when sensible." On January 23, 2012, Mr. Atwell sent Rosenberg an email stating that "[t]he client is asking some questions" about the LVH property. The same day, Rosenberg emailed Mr. Atwell stating that Rosenberg would forward Mr.

Atwell's interest to a "counterpart . . . driving the process," but that Rosenberg and the counterpart were "not in a position to share information just yet."

The following day, Siegel emailed Mr. Atwell: "How is your search going? I haven't heard anything from you. . . ." Mr. Atwell sent a response stating that he was "[s]till working on finding a new location" for Defendants. Siegel sent a follow up email on February 13, 2012, stating that he hadn't heard from Mr. Atwell "in a couple weeks" and asked about "prospects for a new Westgate Resorts in Las Vegas."

On February 18, 2012, Siegel told Mr. Atwell to "go for it" in response to an inquiry from Mr. Atwell as to whether Defendants had ever approached the new Hard Rock tower for purchase. On or around March 15, 2012, Mr. Atwell communicated to Siegel via email that Mr. Atwell had "talked to both hard Rock and Palms" and that he was "still talking with the bank on the [LVH] and some others." Siegel responded, "Keep trying and best wishes on your health."

Mr. Atwell asked Siegel via e-mail dated November 28, 2012 about a property at the Harmon Tower, owned by MGM. Siegel responded with a question about the property and stated "if you can make the deal let's do it. . . . I'm tearing at the bid [sic]. I still have my whole team out there that did $100 million a year for 5 years at the PH Tower." Siegel confirmed in his 2017 deposition that the context for this email was that he was "very excited to get back into Las Vegas[.]"

On December 28, 2012, Siegel emailed Mr. Atwell: "Anything new on the Harmon property, please let me know. In the meantime have a Happy New Year and good health for 2013." Several months later, on February 22, 2013, Mr. Atwell emailed Siegel, CC'ing Ms. Atwell and writing: "Pursuant to our talk, I've contacted both the LVH situation and Starwood/Riviera and both are interested. . . . I think I can arrange a meeting soon." (Id.). Four days later, he sent another email stating: "Starwood and LVH requested a proposal. Please get me a basic prelim outline as soon as possible." Siegel emailed a response the same day, in which he wrote, "What does Starwood have in Vegas? I have been talking to LVH for a long time thru a California broker." Mr. Atwell sent an email to Siegel on February 26, 2013, in which Mr. Atwell wrote: "We[']ve been working on the LVH for many months with the bank via Houlihan Lokey (exclusive agent).

... If you[']re bound to another broker in this regard, I[']ll discontinue my efforts, although I wish you would have told me this last week when we spoke as I started this dialogue with them and told them about you many months ago."

### D. 2012 Engagement of Another Broker to Purchase the LVH

Although Siegel was corresponding with Mr. Atwell throughout 2012, at some point Siegel had engaged another broker, Mayur Shetty ("Shetty"), to purchase the LVH. Siegel and Shetty corresponded previously via email in August 2011, regarding refinancing for PH Towers before its closure.

Goldman Sachs foreclosed upon the LVH property on October 10, 2012. On or about October 17, 2012, Shetty reached out to Gramercy Capital Corp., the other primary creditor for the LVH, via e-mail to inquire about the LVH, on behalf of Defendants. This was the first time Shetty had contacted any entity connected with the LVH, well over a year after Mr. Atwell's first contact with Mr. Rosenberg.

Goldman Sachs took title on the LVH property via 3000 Paradise Road, LLC on November 1, 2012. Westgate Resorts, Ltd.'s Chief Financial Officer, Thomas Dugan, sent Shetty a letter on November 5, 2012, indicating Defendants' interest in purchasing the LVH.

### E. 2013 Engagement of Mr. Atwell and Resort Properties of America to Purchase the Riviera and Simultaneous Contracting for LVH

Siegel, on behalf of Defendants, executed a Letter of Interest on RPA letterhead to the seller's broker for the Riviera Hotel & Casino ("Riviera"), dated March 11, 2013, communicating a cash offer in the amount of $75,000,000.00 and stating that Resort Properties of America was the "exclusive Broker representative" for Defendants and would be paid a fee "As per separate agreement." As confirmed by Siegel in his deposition, Resort Properties of America and Mr. Atwell were the brokers for Defendants for that property. Siegel testified that, at the time he signed the Letter of Intent, he "absolutely" intended to purchase the Riviera. (Id.)

In or around April 2013, Ms. Atwell called Siegel to discuss the fact that Mr. Atwell first introduced Siegel to the LVH and Siegel told her that it was a "moot point" because he was no

longer pursuing the LVH and told her to focus Plaintiffs' efforts on the Riviera, a different Las Vegas property.

Mr. Atwell and Ms. Atwell, on behalf of RPA, began to aggressively pursue brokerage of the Riviera. Ultimately, Defendants did not close on the Riviera deal because, according to Siegel, the Riviera was a "dump" and a "teardown" and was not worth the offer. Siegel testified that he made the offer on the Riviera because "it was a 2,000 room property on 26 acres on Las Vegas Boulevard on the Strip," which was a "better location than the LVH," such that he would had preferred to purchase the Riviera over the LVH.

Meanwhile, at some point in early 2013, Defendants took LVH out of contract after Siegel decided not to buy the property. However, pursuit of LVH was revisited in March 2013, when Shetty and representatives of the LVH listing agent entity, Houlihan Lokey, exchanged emails regarding an offer to begin due diligence on LVH. On April 23, 2013, Siegel emailed a representative of Goldman Sachs stating that Siegel was "even more committed to do this transaction [for LVH] and are prepared to move very quickly once you give us the go ahead."

On October 29, 2013, Atwell and RPA represented a third party in a Letter of Intent for LVH with the same leasing agent, Houlihan Lokey, which included a fee of 2% of the total gross purchase price in the event of closing. The purchase ultimately did not close.

In December 2013, Defendants again had LVH under contract for purchase. Defendants closed on the LVH on July 1, 2014. Siegel testified that Shetty was successful in procuring the LVH for Defendants and was paid a 1% commission fee. (Id. at 22-23).

### F. Ms. Atwell's Objections to Shetty Obtaining the LVH Commission

On April 30, 2013, after Defendants began their second pursuit of the LVH, Ms. Atwell emailed Siegel about Defendants "deal cooking on LVH (Hilton)." She wrote:

"David, as I had mentioned to you recently, I was pretty sure my Dad had previously approached Goldman Sachs all the way back to Sept 30, 2011 (see enclosed email with highlight) on your behalf and he indicated this ongoing conversation to you on March 15 2012 (see enclosed email with highlight) as he had already been communicating with them for quite some time. They couldn[']t divulge much or engage in discussion with you around that time because it was early in the game and before the foreclosure . . . . David, my point here is that we were working diligently on establishing you a property here, including the Hilton. [ ]I[']m pretty sure that this was before any other Broker contacted you in this regard. [ ] My point is we are appealing to your fairness, should you

accomplish a deal on LVH, we would appreciate your consideration for at least part of the fee that you are apparently going to pay another Broker. . . ."

On December 23, 2013, Ms. Atwell sent another email asking Siegel about the commission and additionally offering to connect Siegel to a partner from China for financing. Siegel emailed the following day, stating "I will be happy to discuss it with you and look at your documentation when I see you." Ms. Atwell sent Siegel an email on December 26, 2013, writing: "To be honest, Following up and through on LVH matter with you once it finally did foreclose and was acquirable, did slip through the crack a bit, thus why we didn't present you with the formal package before someone else did once it went to Houlihan [Lokey] to handle. My Dads [sic] health was very rocky at that time. No excuses.. [sic] But that is the truth after the fact of initial initiation and inquiry of the matter."

Ms. Atwell met with Siegel at his office in or around May 2014, prior to Defendants closing on the LVH. Ms. Atwell testified that, at that meeting, Siegel told Ms. Atwell that he would "make it right" and that he would talk to Shetty about potentially splitting the commission with Ms. Atwell. Siegel asked Shetty if he would be willing to split his commission with Ms. Atwell, and Shetty declined.

### G. Siegel's Acknowledgment of Mr. Atwell's Efforts

Siegel's deposition was taken on March 15, 2017. During the deposition, Siegel admitted that he asked Mr. Atwell to find Defendants a property in Las Vegas. Siegel admitted that he never instructed Mr. Atwell to stop looking for a Las Vegas property even through the year 2012, at least until Siegel had the LVH under contract.

## IV. LEGAL STANDARDS

### A. Motion for Summary Judgment

Summary Judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007).

**V.     DISCUSSION**

The Court will begin by analyzing Plaintiffs' claims for quantum meruit, and proceed to analyze the remaining claims.

**A.     Quantum Meruit Claims**

In the absence of an express contract, a party may be able to recover under the theory of quantum meruit, which is a claim that arises either in contract or for restitution for unjust enrichment. Certified Fire Prot. Inc. v. Precision Constr., 293 P.3d 250, 256 (Nev. 2012). A contractual quantum meruit claim may arise if there exists an implied-in-fact contract. Id. "A contract implied-in-fact must be 'manifested by conduct,' [and] . . . 'is a true contract that arises from the tacit agreement of the parties.'" Id. (citations omitted). Quantum meruit may only be applied after the factfinder "conclude[s] that the parties intended to contract and promises were exchanged, the general obligations for which must be sufficiently clear;" the doctrine serves as a "gap-filler to supply [an] absent [contractual] term" such as the reasonable market price for one's service. Id.

However, quantum meruit does not apply when an alleged contract has gaps for all relevant terms. Id. (finding that contract-based quantum meruit did not apply where defendant "never agreed to a contract for only design-related work, the parties never agreed to a price for that work, and they disputed the time of performance.").

Alternatively, courts may apply quantum meruit in the context of unjust enrichment. "Where unjust enrichment is found, the law implies a quasi-contract, which requires the defendant to pay to plaintiff the value of the benefit conferred. In other words, the defendants make restitution

to the plaintiff in quantum meruit." Id. at 257. "Unjust enrichment exists when the plaintiff (1) confers a benefit on the defendant, (2) the defendant appreciates such benefit, and (3) there is "'acceptance and retention by the defendant of such benefit (4) under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." Id. (numbering added).

The Nevada Supreme Court's cases on real estate brokers' commissions do not state which theory of quantum meruit they address. Nonetheless, they make clear that in a claim for collection of a broker's commission, a plaintiff may recovery under quantum meruit if it can be proven that "(1) an employment contract existed, and (2) the broker was the procuring cause of the sale." Atwell v. Sw. Secs., 820 P.2d 766, 768 (Nev. 1991).

"The requirement that an employment contract be found to exist is easily met. . . . Implied employment contracts between sellers and brokers have been found to exist with only moderate factual support." Id. at 768. The court cited a previous case, Shell Oil, in which an employment contract was found to exist where the only evidence of a contract was letters the broker sent to the seller, and price information the broker subsequently received, as well as the seller's knowledge of common real estate practice and awareness of the broker's expectation to be paid. Id. at 768-69 (citing Shell Oil Co. v. Ed Hoppe Realty Inc., 540 P.2d 107, 109-10 (Nev. 1975)).

The Nevada Supreme Court has laid out guidelines for determining when a broker was a procuring cause. "For example, procuring cause requires conduct that is more than merely trifling. In situations not involving exclusive listing agreements, merely introducing the eventual purchaser is insufficient. However, [w]hether the broker first approaches, or brings to the attention of the buyer that the property is for sale, or brings the buyer into the picture, has considerable weight in determining whether the [broker] is the procuring cause of the sale." Id. at 769-70 (citations and quotations omitted). Whether a broker is a procuring cause is a question of fact "generally not appropriate for summary judgment." Id. at 769.

"Where the broker does introduce the eventual purchaser, the burden switches to the seller to show that the broker subsequently abandoned efforts or that the broker's efforts were ineffectual. Where there was an agreement to pay a commission and the broker was the introducing party, he

must also be given the opportunity to consummate the sale. A broker may be deemed to be the procuring cause, even in cases in which the transaction was actually closed by the owner directly and for a different price than the broker's asking price, and in cases in which there was no suggestion of fraud." Id. (citations and quotations omitted). Conversely, where the broker does nothing more than introduce the sellers and eventual buyers, but never meets with or speaks with the buyers before the sale, the broker is not a procuring cause. Binder v. Levy Realty Co., 790 P.2d 497, 499-50 (Nev. 1990).

In their Motion for Summary Judgment, Defendants argue that Plaintiffs' claims for quantum meruit to recover the LVH commission fail because Shetty, and not Mr. Atwell, was the procuring cause of the purchase of LVH. Defendants first contend that quantum meruit cannot be used as a gap-filler, because there was no contract between the parties. Defendants contend that, even if Mr. Atwell was the procuring cause of the purchase of LVH, he abandoned his claim to the commission as he ceased communicating with Defendants between March 2012 and November 2012. Further, Plaintiffs abandoned their claim to the commission by brokering on behalf of another potential purchaser for the LVH in 2013. Defendants also challenge Plaintiffs' claim on the grounds that Plaintiffs have not followed the statutory procedure for licensed brokers obtaining a real estate commission, and further were not licensed business brokers at the time a claim for commission arose.

Plaintiffs argue that quantum meruit can be used as a gap-filler to allow them to recover the commission from the purchase of LVH. Plaintiffs contend that there was no dispute that an implied-in-fact contract was formed when Siegel asked Mr. Atwell to find Defendants a property in Las Vegas; because the question of whether Mr. Atwell was the procuring cause is a factual one that must be left for trial, the Court cannot not resolve the factual dispute at summary judgment in either party's favor.

Plaintiffs additionally argue that, even if Shetty is considered a procuring cause, the case law does not prevent the Court from finding multiple procuring causes. Regarding the issue of abandonment, Plaintiffs contend that Defendants do not present undisputed facts that demonstrate Plaintiffs, via Mr. Atwell, abandoned their claim to the commission; Plaintiffs refer to email

correspondence from Mr. Atwell through 2013 in which he provides reasons for why he believed he was entitled to the commission. Plaintiffs also argue that Defendants' argument regarding statutory real estate licensing requirements fails because Ms. Atwell was a licensed real estate salesperson in association with a licensed broker at the time Plaintiffs' claim for the commission was ripe, in July 2014.

As the Court will discuss below, a valid employment contract existed. Therefore, the Court must determine whether Plaintiffs may assert a claim to the commission on a theory of contractual quantum meruit. The Court first notes that, as a threshold matter, there are two ways to analyze the LVH commission: the Court may treat the fee as a real estate commission, pursuant to NRS § 645, or the Court may construe the fee more broadly, such as a "finders fee" or other arrangement pursuant to contract. The Court will discuss both interpretations of the commission in the context of Plaintiffs' quantum meruit claims.

Viewing the LVH commission as one that can only be claimed pursuant to Nevada real estate law, the Court finds that Plaintiffs can only establish entitlement to the commission if the statutory procedure is followed. See NRS § 645.270 (providing that an individual who is not a licensed real estate broker or real estate salesperson cannot assert a claim for compensation or commission related to a real estate transaction); see also Davis v. Jouganatos, 402 P.2d 985, 987 (Nev. 1965) ("[A] complaint seeking recovery of a real estate broker's commission which fails to allege that the plaintiff was licensed as a real estate broker or salesman does not state a cause of action.") (citations omitted). Real estate licensing requirements cannot be waived. Islandia, Inc. v. Marechek, 420 P.2d 5, 7 (Nev. 1966).

Under Nevada law, a real estate broker is a person who engages in or assists in engagement in the purchase, sale, leasing, or listing of property with the expectation of receiving compensation. NRS § 645.030. Pursuant to NRS § 645.035, a real estate salesperson is a licensed person who associates as an employee or independent contractor with a licensed real estate broker for the purpose of engaging in the acts specified in Section 645.030. The Court finds that the undisputed facts demonstrate that Ms. Atwell was a licensed real estate salesperson at the time a claim for the LVH commission became ripe or due. Defendants do not contest the validity of Plaintiffs'

proffered exhibit which shows that Ms. Atwell had an active license as a real estate salesperson with the State of Nevada Real Estate Division, in association with a real estate brokerage company from January 1, 2014 until at least November 16, 2015. The Court does not find that Ms. Atwell is precluded from asserting a claim for commission because she is no longer associated with the same licensed broker that had the initial expectation of compensation, Mr. Atwell. The Court finds that the purpose and intent of Nevada real estate laws is to prevent unlicensed brokers and salespeople from engaging in the practice of real estate and seeking commissions for that unlicensed practice, not to prevent licensed real estate salespeople from asserting a claim to commission after re-associating with different brokers.[1] The Court also notes that in this case Ms. Atwell presumably could not continue to practice as a licensed real-estate salesperson if she did not associate with another licensed broker after Mr. Atwell's death. The real estate laws were not intended to frustrate her ability to do so.

Defendants additionally contend that, because the purchase of LVH also involved the purchase of a business entity, here an LLC, Plaintiffs cannot assert a claim to the commission unless they or Mr. Atwell were licensed business brokers. NRS § 645.0075 defines a business broker as a person who sells, purchases, rents or leases a business as part of an interest in real property. Under NRS § 645.863, a licensed real estate broker or real estate salesperson may apply for a permit to conduct business as a business broker. The applicant must provide proof of completed business brokerage instruction. NRS § 645.863(2)(a). There is no dispute that neither Mr. Atwell nor Ms. Atwell were at any relevant time in possession of permits to practice as business brokers. The question that remains for the Court is whether any of the Plaintiffs can assert a claim for a commission where the underlying real estate transaction also involved the purchase of membership in an LLC.

The Court finds that the purpose of the business broker statute is to prevent the unlicensed practice of real estate when a transaction primarily involves the purchase or sale of a business. The Court has examined the legislative history of NRS § 645.0075, and finds that the statute was

---

[1] Nevada Administrative Code ("NAC") § 645.350 permits a licensee who is associated with a real estate broker to re-associate her license with another licensed real estate broker.

amended in 2013 to address a previous lack of clarity in the statute, which led to out-of-state unlicensed individuals entering Nevada and attempting to purchase and sell businesses under the belief that Nevada securities laws would not apply because the transactions were not purely for securities. See Assembly Cmte. Minutes, A.B. 225, 77th Gen. Assemb., Reg. Sess. (Nev. 2013). The 2013 amendment of the statute struck language pertaining to real estate practitioners. The Court finds that purchase of the LVH does not fall within the scope of the Nevada business broker laws and therefore the real estate broker seeking a commission for the sale of the LVH was not required to possess a business broker permit. The Court finds that the statute is not meant to impose additional requirements on licensed real estate brokers and salespeople when the primary purpose of a transaction is to purchase or sell real estate, and the acquisition of business interests is only incidental. Given these interpretations of the law, Plaintiffs may assert a claim to commission pursuant to Nevada real estate law, under a theory of quantum meruit.[2]

If the Court alternatively construes the LVH commission as a "finders fee" or other type of fee arrangement to which the parties contracted, the inquiry is far simpler. Quantum meruit allows the reasonable value of the party's services to fill the gap in a contract. There is no dispute that Siegel was willing to pay a fee to broker that assisted him in closing on the LVH, and further there is no dispute that Siegel paid a fee amounting to 1% of the purchase price to Shetty following the successful acquisition of LVH in July 2014.[3] As there are disputes of fact as to whether Mr. Atwell was a procuring cause of the purchase, such that Plaintiffs would be able to seek this fee as compensation, or whether Mr. Atwell abandoned his claim and thus Plaintiffs are precluded from

---

[2] The Court rejects Defendants argument that Plaintiffs are not entitled to seek the commission because a contractual right of recovery of a commission was never preserved under the procedure set forth in NAC § 645.350(3). Pursuant to this regulation, Mr. Atwell's death on November 25, 2013 caused his license to automatically expire. As Ms. Atwell was not a licensed real estate broker, she could not qualify to be acting broker of RPA after Mr. Atwell's death; even if she was qualified, the period for acting as broker for RPA would have only lasted for 60 days. Furthermore, the regulation does not appear to require the operation of a brokerage to preserve a claim to commission.

[3] The Court recognizes that Siegel indicated that whether a broker was properly licensed or not was not relevant to his pursuit of the purchase of LVH, because a real estate commission and finder's fee were "the same thing to [him]."

- 13 -

1  recovering a fee, there are genuine issues that remain for trial. Summary judgment on the quantum
2  meruit claims is therefore denied.

### B.      Breach of Contract Claim

Under Nevada law, to show a breach of contract a plaintiff must show "(1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 899 (9th Cir. 2013) (citing Richardson v. Jones, 1 Nev. 405, 409 (1865)). Breach of contract is "a material failure of performance of a duty arising under or imposed by agreement." Bernard v. Rockhill Dev. Co., 734 P.2d 1238, 1240 (Nev. 1987).

"Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." May v. Anderson, 119 P.3d 1254, 1257 (Nev. 2005). The question of whether a contract exists is one of fact. Id. at 1257 (footnote omitted).

The parties dispute the existence of a contract. Defendants contend that there is no evidence of an agreement, written or otherwise, between Mr. Atwell and Defendants to pay Mr. Atwell for his brokerage services in connection with the LVH. Defendants argue that Mr. Atwell's September 2011 emails to Goldman Sachs do not constitute evidence of a contract because LVH was not for sale at the time, Defendants had no knowledge of these communications, and Defendants did not have the resources at the time to buy LVH nor contract with Mr. Atwell to represent them in a purchase.

Plaintiffs contend that there was an oral employment agreement, or at least an implied-in-fact contract, that Mr. Atwell would provide his brokerage services to Siegel in exchange for payment. Plaintiffs argue that there is no dispute that Siegel asked Mr. Atwell for his assistance in procuring a property in Las Vegas.

The Court finds that there is no dispute that there was at least an implied-in-fact contract between the parties, as there was a meeting of the minds as to Mr. Atwell actively seeking a resort property in Las Vegas on Defendants' behalf. There is no evidence to suggest that Defendants believed Mr. Atwell did not expect payment. The Court further finds that this is a case where industry practices would dictate that Mr. Atwell would expect commission. With respect to the purchase of the LVH in particular, the Court finds that the undisputed facts also suggest the

existence of a contract. The Court finds that there is no dispute that Mr. Atwell discussed LVH with Siegel; the fact that the discussion took place before the foreclosure and sale of the property, and before Defendants had resources to purchase the property, is irrelevant for the existence of the contract. The undisputed evidence demonstrates that the parties intended for Mr. Atwell to be compensated if his brokerage services led to the purchase of LVH. Therefore, summary judgment is denied as to Plaintiffs' breach of contract claim. The question of whether a breach in fact occurred is properly one for the jury.

### C. Breach of Implied Covenant Claim

Under Nevada law, an implied covenant of good faith and fair dealing exists in every contract. Pemberton v. Farmers Ins. Exch., 858 P.2d 380, 382 (Nev. 1993). "Where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 808 P.2d 919, 922-23 (Nev. 1991). Even in the absence of a breach of contract, a plaintiff may still recover damages for breach of the implied covenant of good faith and fair dealing. Id. at 922.

Defendant contends that, because there was no valid contract, this claim can be summarily dismissed as a matter of law. Plaintiff argues in respond that Defendants claim fails because the undisputed facts demonstrate that a contract did exist.

As the Court has found that there is no dispute as to the existence of a contract, the Court finds that summary judgment of the breach of implied covenant claim is unwarranted, and the claim is left for trial by the jury.

### D. Fraud Claims

To prevail on a claim for fraud, plaintiff must establish "that the defendant made a false representation that the defendant knew or believed was false, that the defendant intended to persuade the plaintiff to act or not act based on the representation, and that the plaintiff had reason to rely on the representation and suffered damages. Franchise Tax Bd. of State of Cal. v. Hyatt, 407 P.3d 717, 738 (Nev. 2017) (citation omitted). The Federal Rules of Civil Procedure require the elements of fraud to be pled with particularity. Fed. R. Civ. P. 9(b). "It is the jury's role to

1 make findings on the factors necessary to establish a fraud claim. . . . [The] court will generally
2 not disturb a jury's verdict that is supported by substantial evidence, [which is] evidence that a
3 reasonable mind might accept as adequate to support a conclusion." Franchise Tax Bd., 407 P.3d
4 at 738 (citations omitted).

5 Defendants contend that Plaintiffs' fraud claims fail as a matter of law because Plaintiffs
6 make broad allegations that Mr. Atwell and Ms. Atwell were defrauded by misrepresentations
7 Siegel made in emails, as well as by statements made in a 2014 meeting with Thomas Dugan, the
8 Chief Financial Officer of CFI. Defendants argue that Plaintiffs do not provide any evidence of
9 how they were misled or how Defendants benefitted from the alleged fraud. With respect to the
10 Riviera transaction, Defendants posit that Plaintiffs' claims of fraud fail because Defendants, via
11 Siegel, had a legitimate interest in the Riviera and employed Mr. Atwell and Ms. Atwell in good
12 faith.

13 Plaintiffs argue that summary judgment on their fraud claims is unwarranted. Plaintiffs
14 contend that there is a genuine dispute of fact as to Siegel's intent with regard to the Riviera
15 negotiations. Moreover, Plaintiffs argue that the circumstances at the time – namely, Defendants
16 simultaneous pursuit of LVH and financial inability to afford both properties – could lead a jury
17 to conclude that Defendants had no real intent to pursue purchase of the Riviera and just wanted
18 to distract Mr. Atwell and Ms. Atwell from pursuing the LVH.

19 The Court finds that there is a genuine dispute of fact as to Plaintiffs' fraud claims. While
20 the Court does not find that the 2012 emails between Siegel and Mr. Atwell or the 2014 meeting
21 between Ms. Atwell and Thomas Dugan standing alone are sufficient to raise a dispute of fact, the
22 Court finds that the context and circumstances leading up to the negotiations for the Riviera and
23 the subsequent discontinuation of the purchase of the Riviera and simultaneous pursuit of the LVH
24 suggest that there is a dispute as to Siegel's intention in asking Mr. Atwell and Ms. Atwell to focus
25 on the Riviera property rather than the LVH.  A reasonable juror could find that, given the financial
26 status of Defendants in mid-2013, and Dugan's testimony that he did not recall Siegel proposing
27 a cash offer and signing a Letter of Intent for the Riviera, Siegel knew that he did not intend to
28 pursue the Riviera but intended to persuade Mr. Atwell and Ms. Atwell to pursue that property

instead of LVH. For these reasons, summary judgment in favor is not appropriate, and the claims for fraud will proceed to trial.

**VI.  CONCLUSION**

For the reasons stated above,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 60) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (ECF No. 64) is DENIED.

The parties are instructed to file a joint pretrial order by **April 25, 2018**.

DATED: March 31, 2018.

**RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE**